## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cardiac Science, Inc.,                                                   Civil No. 03-1064 (DWF/RLE)
a Delaware Corporation,

                Plaintiff,

v.                                                         **MEMORANDUM**
                                                          **OPINION AND ORDER**

Koninklijke Philips Electronics N.V.,
a Netherlands corporation doing business
as Royal Philips Electronics; Philips Electronics
North America Corporation, a Delaware
corporation; and Philips Medical Systems North
America Company, a Delaware corporation,

                Defendants,

and

Koninklijke Philips Electronics N.V.,
A Netherlands corporation; and
Philips Electronics North America Corporation,
a Delaware corporation,

                Counter-Claimant,

v.

Cardiac Science, Inc.,
a Delaware corporation,

                Counter-Defendant.

_____

Aaron W. Davis, Esq., Bradley D. Pedersen, Esq., Eric H. Chadwick, Esq., Randall Thomas Skaar, Esq., Tye Biasco, Esq., and Scott Gregory Ulbrich, Esq., Patterson Thuente Skaar & Christensen, PA, counsel for Plaintiff and Counter-Defendant.

Adam R. Steinert, Esq., Eugene L. Chang, Esq., Gary Serbin, Esq., Hilary R. Kastleman, Esq., John M. DiMatteo, Esq., Kimberly May Rosen, Esq., Leslie M. Spencer, Esq., Spyros S. Loukakos, Esq., and Steven H. Reisberg, Esq., Willkie Farr & Gallagher LLP; and Lawrence J. Field, Esq., David D. Axtell, Esq., Douglas B. Greenswag, Esq., and Harold D. Field, Jr., Esq., Leonard Street and Deinard - Minneapolis, counsel for Defendants and Counter-Claimants.

**Introduction**

The above-entitled matter came before the undersigned United States District Judge on June 27, 2005, pursuant to Plaintiff Cardiac Science, Inc.'s ("Cardiac Science") Motion for Partial Summary Judgment of Inequitable Conduct and Motion to Dismiss Certain Royal Philips Counterclaims of Patent Infringement for Lack of Standing. In its First Amended Complaint (the "Complaint"), Cardiac Science asserts that Defendants Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, and Philips Medical Systems North America, Inc. (collectively, "Philips") made and sold defibrillator products that infringe ten U.S. Patents owned by Cardiac Science, namely, U.S. Patent Nos. 5,402,884 (the "'884 Patent"); 5,579,919 (the "'919 Patent"); 5,645,571 (the "'571 Patent"); 5,700,281 (the "'281 Patent"); 5,797,969 (the "'969 Patent"); 5,984,102 (the "'102 Patent"); 6,088,616 (the "'616 Patent"); 5,897,576 (the "'576 Patent"); 6,029,085 (the "'085 Patent"); and 6,366,809 B1 (the "'809 Patent") (collectively, the "Cardiac Science Patents"). The Complaint further asserts a declaratory judgment action for invalidity and noninfringement of the following U.S. Patents owned by Philips: U.S. Patent No. 6,016,059 (the "'059 Patent"); 5,879,374 (the "'374 Patent"); 5,800,460 (the "'460 Patent"); 6,047,212 (the "'212 Patent"); 5,607,454 (the "'454 Patent"). Philips'

2

Third Amended Answer with Amended Counterclaims (the "Answer") asserts noninfringement and invalidity of the Cardiac Science Patents.  Philips also asserts unenforceability due to inequitable conduct of the '571 Patent, the '969 Patent, the '281 Patent, and the '616 Patent.  Finally, the Answer contends that Cardiac Science has infringed the following U.S. Patents owned by Philips:  the '059 Patent, the '374 Patent, the '460 Patent, the '212 Patent, the '454 Patent, and U.S. Patent Nos. 5,591,213 (the "'213 Patent"), 6,230,054 B1 (the "'054 Patent"), 5,773,961 (the "'961 Patent"), 5,899,926 (the "'926 Patent"), 5,904,707 (the "'707 Patent"), and 5,868,792 (the "'792 Patent").  In its Reply to Defendants' Third Amended Answer with Amended Counterclaims (the "Reply"), Cardiac Science asserts, among other affirmative defenses, that the following Philips patents are unenforceable due to inequitable conduct:  the '213 Patent, the '059 Patent, the '374 Patent, the '460 Patent, the '212 Patent, the '879 Patent, the '454 Patent, the '961 Patent, and the '054 Patent.  For the reasons stated below, Cardiac Science's motions are denied.

**Background**

Cardiac Science is a Delaware corporation with its principal place of business in California. Defendant Koninklijke Philips Electronics N.V. is a Netherlands corporation with its principal place of business in The Netherlands.  Defendant Philips Electronics North America Corporation is a Delaware corporation with its principal place of business in New York.  Defendant Philips Medical Systems North America, Inc., is a Delaware corporation with its principal place of business in Washington. Philips Medical Systems North America is a division of Philips Electronics.

This case involves numerous patents for automatic external defibrillators ("AEDs"), which are portable electronic devices that allow a person with no medical training to administer a defibrillation shock to a person who is in sudden cardiac arrest.

Cardiac Science has filed two motions. In its Motion to Dismiss, Cardiac Science contends that Philips lacks standing to bring certain of its counterclaims of patent infringement. In its Motion for Partial Summary Judgment of Inequitable Conduct, Cardiac Science asserts that Philips violated its duty of candor before the PTO, thus rendering the '213, '460, '374, '059, '454, '212, and '054 Patents unenforceable as a matter of law.

**I.     Motion to Dismiss**

    **A.     Standard of Review**

In deciding a motion to dismiss, the Court must assume all facts in the Complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *See Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). The Court grants a motion to dismiss only if it is clear beyond any doubt that no relief could be granted under any set of facts consistent with the allegations in the Complaint. *Id*. The Court may grant a motion to dismiss on the basis of a dispositive issue of law. *See Nietzke v. Williams*, 490 U.S. 319, 326 (1989). The Court need not resolve all questions of law in a manner which favors the complainant; rather, the Court may dismiss a claim founded upon a legal theory which is "close but ultimately unavailing." *Id.* at 327.

The party invoking federal jurisdiction bears the burden of establishing that standing exists. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

    **B.     Discussion**

From 1981 to 1992, Carlton Morgan was an employee at Physio-Control Corporation ("Physio-Control"), where he worked as an engineer designing defibrillators. On June 2, 1981, Morgan signed an Employee Invention Agreement (the "Invention Agreement") with Physio-Control. (Declaration of Eric H. Chadwick in Support of Corrected Motion to Dismiss Certain Royal Philips Counterclaims for Patent Infringement for Lack of Standing filed by Cardiac Science, Inc. ("Chadwick Decl. I") Ex. 1.) The Invention Agreement stated:

> This agreement concerns contributions and inventions conceived or made by me, alone or with others:
>
> A. While I am employed by the company whether or not during working hours; and
>
> B. that relate to the business of the company or to any reasonable expansion of such business, or result from my work for the company.
>
> As to these, without additional compensation, I agree:
>
> 1. To disclose them promptly in writing to the company;
>
> 2. that all such contributions and inventions are to become the property of the company whether or not patent applications are filed thereon;
>
> 3. to assign them to the company or to its designee; and
>
> 4. to assist the company and its designees to obtain patent protection in any place and at any time it may elect, the company to pay the expenses.

(*Id.* at 1.)

In September 1982, while still an employee at Physio-Control, Morgan made the following notations in a laboratory notebook:

5

> "Could have A/D look at battery periodically to check voltage and decide what to do"
>
> "When a 'self-test' activated by long-timer, could set external indicator if a failure"
>
> "Long term power switch to periodically turn unit on for self-initiated self-test."

(Chadwick Decl. I, Ex. 5 (the "Laboratory Notebook") at PHY 098861-62.)  The Philips Defendants contend that, six years later, Morgan was approached by Daniel Yerkovich, another Physio-Control engineer, with a similar idea that a defibrillator could be constructed that could test itself periodically. However, none of these ideas were developed during Morgan's tenure at Physio-Control.

In November 1992, Morgan and four other employees resigned from Physio-Control and founded Heartstream, Inc. ("Heartstream").  After founding Heartstream, Morgan and his colleagues began to research and develop technologies related to AEDs.  The Philips Defendants assert that new and independent research conducted at Heartstream led to Morgan's inventions in the '631 Patent application, the '059 and '213 Patents, and the '374 and '460 Patents.  These patents were assigned to Heartstream and ultimately assigned to Philips when it acquired Heartstream in 2001.

In 1995, Physio-Control sued Heartstream in Washington state court, alleging that Heartstream and its co-founders had misappropriated Physio-Control's trade secrets and inventions related to the AED technology.  Physio-Control asserted that it was the owner of legal and equitable title of various patent applications claiming priority from the '631 Patent, because the subject matter of these patents was conceived at Physio-Control.  Ultimately, Physio-Control and Heartstream settled this litigation, with a Confidential Settlement Agreement (the "Settlement Agreement") and Heartstream's payment of $1.6 million to Physio-Control.  The Settlement Agreement stated:

> Except for the express obligations contained in this Agreement, Physio-Control (including its officers, directors and managing agents) hereby releases, discharges, and acquits Heartstream, including its predecessors, successors, assigns, officers, directors, employees, attorneys, consultants, agents, insurers, distributors, suppliers, customers, and end-users of its products, and the Heartstream Founders, including their spouses, heirs, successors, assigns and insurers, from all manner of claims, demands, liabilities and rights of actions of any kind, against them, or any of them, whether in law or in equity, fixed or contingent, known or unknown, foreseen or unforeseen, which Physio-Control may now have or may ever have had with respect to all transactions, occurrences, acts or omissions which occurred on or prior to the Effective Date of this Agreement and which relate in any way to the Litigations, to the employment of the Heartstream Founders or the field of defibrillation.

(Chadwick Decl. I, Ex. 13 ("Settlement Agreement") at 6-7.)  The Settlement Agreement stated:

> Physio-Control hereby covenants not to sue Heartstream, including its predecessors, successors, assigns, officers, directors, employees, attorneys, consultants, agents, insurers, distributors, suppliers, customers, and end-users of its products, and the Heartstream Founders, including their spouses, heirs, successors, assigns and insurers, upon any claim, demand, or right of action related to any misappropriation or infringement of any Physio-Control Intellectual Property related to Self-Test, Communications and Data Storage.

(*Id.* at 8-9.)  The Settlement Agreement defined "Heartstream Intellectual Property" as "all Intellectual Property currently owned or held by Heartstream. . . ."  (*Id.* at 4.)

On March 2, 2005, Philips filed its Supplemental Memorandum in Opposition to Cardiac Science's Motion to Compel Discovery under the "Crime-Fraud" Exception to the Attorney Client Privilege.  (Doc. No. 143.)  In that Memorandum, Philips stated:

> Discovery in this case has shown that (1) Mr. Morgan thought of the broad idea of a periodic self test for an AED years before Mr. Yerkovich; and (2) Mr. Yerkovich's idea never met the legal requirements for invention, and thus could not be material to anything.  Not surprisingly, Physio-Control never specifically alleged that Mr. Yerkovich was an inventor of periodic self-test in AEDs . . . – the interrogatory response upon which Cardiac Science relies concerns how Carl Morgan "[h]ad knowledge of the alleged trade secret," *not* who was an inventor.

7

> As subsequent discovery has confirmed, Mr. Morgan, not Mr. Yerkovich, was the first inventor of a periodic self test for an AED. Mr. Morgan's idea was memorialized in a 1982 entry in his laboratory notebook describing the potential use of a long-term or "watchdog" timer to trigger periodic self-testing.
>
> . . .
>
> Put simply, Yerkovich's idea did not constitute an invention because they [sic] did not reach the level of development necessary for conception of an invention as a matter of law. For an invention to be "conceived" as the term is used in patent law, an inventor must have a full and complete idea of how to create their invention. . . . Physio-Control did nothing to develop the idea of a periodic self-test for a defibrillator for many years. . . . It was not until Mr. Morgan left Physio-Control in 1992 and gave substantial thought and energy to the problem of how to actually create a self-testing AED that a defibrillator that could periodically self test was invented.

(*Id.* at 8-11 (internal citations omitted) (emphasis in original).) Cardiac Science asserts that Philips' statements that Morgan was the inventor of the periodic self-test and that Morgan memorialized his idea in the 1982 laboratory notebook represent a "judicial admission" that Morgan invented the periodic self-test for an AED while he was employed at Physio-Control. Cardiac Science contends that Physio-Control has an ownership interest in the periodic, self-test invention and any patents that embody the invention because the invention was conceived by Morgan while he was employed by Physio-Control and the Invention Agreement assigned any rights that Morgan had to Physio-Control. Therefore, Cardiac Science maintains that Philips does not have standing to proceed with litigation of the self-test patents without joining Physio-Control as a counterclaim-plaintiff.

The Court finds that Cardiac Science's motion is without merit. Taking the language of Philips' Supplemental Memorandum in context, Philips did not make a "judicial admission" that Morgan invented the self-test patents while at Physio-Control. Philips merely asserted that Morgan came up

with the idea while at Physio-Control, but the idea never swelled to the level of a conception of an invention until he was at Heartstream.

The Court finds that fact questions exists as to whether Morgan's "idea" actually constituted a definite and complete idea of how to create his invention. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). Without even reaching that issue, however, Physio-Control's ability to assert legal title to the self-test patents is called into question by the Settlement Agreement signed by Heartstream and Physio-Control in 1997. In that Settlement Agreement, the parties covenanted that any intellectual property "currently owned or held" by Heartstream constituted "Heartstream Intellectual Property." (Settlement Agreement at 4.) Undisputedly, Heartstream held the patents at issue at the time of the Settlement Agreement. The parties consented to dismissal with prejudice of any claim asserted, as well as any claim that could have been asserted, related to the litigation. (*Id.* at 6-7.) In addition, Physio-Control waived any right to sue Heartstream, or its successors, as to any Physio-Control Intellectual Property related to self-test technology. (*Id*. at 8-9.) For these reasons, the Court finds that Physio-Control is not in a position to assert legal title to any of the self-test patents at issue. Thus, Cardiac Science's Motion to Dismiss for lack of standing is denied.

### III.    Motion for Partial Summary Judgment

In its Motion for Partial Summary Judgment, Cardiac Science asserts that several of Philips' patents are unenforceable due to numerous acts of inequitable conduct before the PTO.

#### A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the

evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

A patent is unenforceable for inequitable conduct if, during prosecution of the patent, the applicant withheld material information from the PTO or submitted false information with intent to deceive or mislead the examiner into granting the patent. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1326 (Fed. Cir. 2000). In order to succeed on its motion, Cardiac Science must demonstrate, by clear and convincing evidence, that Philips' conduct was both material and that Philips intended to deceive the PTO.

    **B.    Discussion**

        **1.    The Physio-Control Trade Secret and Patent Litigation**

In addition to the 1995 litigation between Physio-Control and Heartstream discussed *supra*, on January 10, 1997, Heartstream filed a complaint against Physio-Control alleging that Physio-Control was infringing the '213 Patent. The litigation settled in October 1997 through the Settlement Agreement.

Cardiac Science asserts that Philips failed to disclose both the trade secret and the patent litigation to the PTO during prosecution of Philips' Self-Test Patents and Waveform Delivery Patents. Cardiac Science maintains that the litigation was "material," as determined by Magistrate Judge Raymond L. Erickson in his February 4, 2005, discovery order. In addition, Cardiac Science contends that Philips failed to disclose allegations made by Physio-Control regarding incorrect inventorship and the positions regarding patentability taken by Heartstream in defense of the lawsuits that were contrary to the positions it simultaneously made to the PTO during prosecution of its patents. Philips, on the other hand, contends that the previous litigation did not go to the question of inventorship, but rather to the question of ownership, of the self-test inventions. In addition, Philips asserts that all material references were disclosed to the PTO in the prosecution of the patent applications at issue.

The Court finds that Cardiac Science's Motion for Partial Summary Judgment is inappropriate in this regard. First, the Court agrees with Philips that the subject matter of the trade secret and patent litigation between Physio-Control and Heartstream did not go to the question of inventorship of the patents at issue. Philips asserts, and Cardiac Science does not dispute, that Physio-Control never alleged that Dan Yerkovich invented the periodic self-test in AEDs. Magistrate Judge Erickson's finding regarding materiality, made before discovery on this issue was completed, went to the specific question of whether *in camera* review of Philips privileged documents would take place. Magistrate

Judge Erickson's determination does not constitute the law of the case as to the issue of inequitable conduct and the Court is not bound by the finding for purposes of the current motion before this Court.

In addition, the Court finds that summary judgment is inappropriate as to Cardiac Science's assertions that Philips made allegations during the course of the trade secret litigation that were inconsistent with representations Philips made during prosecution of its patents. The Court is somewhat perplexed by Cardiac Science's approach. In its opening brief, Cardiac Science cites numerous examples of inconsistent representations made between the litigation and the patent prosecution. After Philips responded to many of these allegations with evidence that prior art had, in fact, been provided to the PTO, Cardiac Science disavowed its argument that specific instances of misconduct were material. (*See* Plaintiff Cardiac Science, Inc.'s Reply Brief for its Motion for Partial Summary Judgment of Inequitable Conduct at 4 ("Cardiac Science's motion, as directed toward the discovery responses, is based not on the specific materiality of each prior art reference, but rather, on the overarching representations made by Philips that the Physio-Control trade secrets disclosed in Philips' patent applications were well known to the public."). In the absence of specific allegations of misconduct, the Court cannot determine whether such "overarching representations" were either material or intentional. Cardiac Science's motion for partial summary judgment is denied.

    **2.**    **The Morgan Declaration**

During the prosecution of the '631 application, the PTO rejected all pending claims under 35 U.S.C. § 103 as obvious over U.S. Patent 5,249,573 in view of the "Viva Link AED," a publication that included an undated, two-page SurVivaLink Corporation Product Brochure and a two-page Progress Report dated November 1993. The two documents had been submitted to the PTO in June

1994 as part of the pending '631 application. In response to the PTO's rejection, Morgan submitted a declaration to the PTO stating that he was the sole inventor of the invention disclosed in the '631 application, that the "'VIVAlink AED' brochure is a companion publication to the 'SurVIVAlink Corporation Progress Report November 1, 1993' publication," and that "[c]hecking with the printer of both publications indicated that they were printed together some time during the third quarter of calendar year 1993." (Declaration of Eric H. Chadwick in Support of Motion for Partial Summary Judgment of Inequitable Conduct ("Chadwick Decl. II") at Ex. 10, CSI 003467-3468.) Morgan further stated that the publication was not prior art because it was published after the filing date of his patent application. (*Id.* at 003468.)

According to Byron Gilman, the CEO and Chair of the Board of Directors of SurVivaLink from 1992-96 and the person who supervised the printing and reproduction of the VivaLink AED brochures through at least 1993, Morgan never checked with him or anyone else at SurVivaLink regarding the VivaLink AED brochure. Gilman also testified that the VivaLink AED brochure was printed before the Progress Report, and that the Progress Report and brochure were not "companion publications" as stated by Morgan.

When Morgan was deposed in October 2004 about his statements regarding the VIVAlink AED, the following exchange took place:

> [Q:] How did you come to the conclusion that the first two pages, the Vivalink AED brochure, is a companion publication to the last two pages, which is the progress report?
>
> A: Well, this was done almost a decade ago, so I'll tell you right now my memory of the details of this are very vague. I didn't spend a lot of time on this.

13

As I recall, both of these, all four pages came in, came in to Heartstream together. I mean, your question was why did we think they were companion publications?

Q: Correct.

A: They came together, they looked like they were of the same format, similar style. We didn't have any reason to believe they weren't together, that they weren't handed out together.

Q: You said they came in to Heartstream together.

How did they come in to Heartstream?

A: Again, this is a long time ago. I'm not sure how they came in.

. . .

Q: Your declaration recites, "Checking with the printer of both publications indicated that they were printed together sometime during the third quarter of calendar year 1993."

Now that sentence is written a little awkwardly, but from that are you saying that you checked with the printer?

A: No. There was checking.

Q: Okay.

A: Go ahead.

Q: What does it mean then checking with the printer?

A: As best I can recall, what happened was I was asked to look into the date of these, of these four pages.

At that time, Heartstream was originally connected with the medical device world, had a lot of contacts. I asked around, how could I find this out. I was given a name to call.

>I called this man – he said – and outlined what I was looking for. He said I think I can get you the information you need, I think that's right, let me check and I'll talk to you in a day. And we had a subsequent conversation, and that was it.
>
>. . .
>
>Q:     . . . well, as you sit here today and you think back on this, do you think you would have called Survivalink Corporation to ask them, or would you have [a]voided that because they were a competitor, or again just no memory?
>
>A:     I don't remember specifically. It probably wouldn't have been my first choice, but I wouldn't rule it out.
>
>Q:     Now, you said that you talked to this gentleman and he somehow convinced you that, in fact, the publications were printed together sometime during the third quarter of calendar year 1993. And I think you testified that you found what he said to be credible.
>
>A:     I didn't have any reason to disbelieve it, is probably a better way to put it.
>
>Q:     Okay.
>
>Do you remember – so it was more an issue of you didn't have any reason to disbelieve it, but you don't recall anything that he said to you in particular that you thought, oh, yeah, that's why this is really credible information?
>
>A:     I just don't remember.

(Chadwick Decl. II at Ex. 3, Deposition of Carlton Morgan ("Morgan Dep.") at 260-61, 263-264, 274.)

Cardiac Science alleges that Morgan did not check with the printer and had no knowledge of anyone else having checked with the printer. In addition, Cardiac Science asserts that Morgan did not know the publication date of the Product Brochure or whether it was a companion to the Progress Report. Finally, Cardiac Science contends that Morgan asserted that the documents were companion

15

publications so that he could date the Product Brochure after May 1993, when Morgan's patent application was filed. Cardiac Science does not dispute, however, that the VivaLink Product Brochure was in fact printed after May 1993.

Philips asserts that Morgan probably obtained the Product Brochure and Progress Report after a Heartstream employee attended an EMS show in Winnipeg. Philips contends that after receiving the documents, Morgan provided them to his patent attorney to be submitted to the PTO. Philips asserts that, after being requested to do so by the PTO, Morgan undertook an investigation to determine the date of the Product Brochure. In support of this contention, Philips set forth phone records from Heartstream that indicated calls in January 1995 to a marketing consultant for SurVivaLink on the day after Morgan spoke with the patent examiner. (R. Tr. of June 27, 2005, hearing at 62-68.) In addition, Philips has set forth evidence demonstrating that Cardiac Science made the same representations before the PTO regarding the SurVivaLink Product Brochure and Progress Report–that the Product Brochure and Progress Report were one document and that the Product Brochure was published in November 1993. (Declaration of David D. Axtell in Support of the Philips Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment of Inequitable Conduct ("Axtell Decl.") at Exs. 37-42.)

The Court finds that Cardiac Science's Motion for Partial Summary Judgment is inappropriate as to the Morgan declaration. Considering that the Progress Report and Product Brochure had nearly identical formats, that Morgan testified he received the two documents at the same time, and that Survivalink's CEO testified that the two documents were at times distributed together, the Court finds that Morgan's statement that the two documents were "companion publications" was not a

misrepresentation to the PTO.  In addition, the Court is not willing to weigh Morgan's credibility as to his statements that "checking" was done as to the publication date of the Product Brochure.  Such questions are for a jury to decide, and render summary judgment inappropriate.

### 3. The Powers Declaration

In April 1999, Philips filed the U.S. Patent application that ultimately resulted in the issuance of the '054 Patent, for which Daniel Powers was the sole inventor.  During the prosecution of this application, the PTO rejected the application in view of a protection circuit that was disclosed in two patents by Kent Leyde–U.S. Patent Nos. 6,119,039 and 6,104,953–that were both filed in January 1999.  To overcome the rejection, Powers submitted the following declaration to the PTO in January 2001:

> A protection circuit is described in U.S. Patent 6,104,953 to Leyde (e.g. Col. 4, L. 61 – Col. 5, L.22) and U.S. Patent 6,119,039 to Leyde (e.g. Col. 4, L. 36-60).  This disclosure constitutes my own work.  Mr. Leyde and I were coworkers at the time I did this work.
>
> I did this work in the United States as [sic] least as early as Jan 27, 1999.

(Axtell Decl. at Ex. 53.)  The declaration resulted in withdrawal of the rejection and the '054 patent was issued.

Cardiac Science asserts that Powers' declaration contains false statements about inventorship that were material to the patentability of the '054 Patent.  Philips, on the other hand, asserts that the Powers declaration is accurate, and that Powers invented the protection circuit disclosed in the Leyde references, even if the protection circuit invented by Powers is not identically configured with that of the Leyde references.

The Court finds that genuine issues of material fact preclude summary judgment on this issue. Based on the depositions of Powers and Leyde, it is not clear to the Court whether both Powers and Leyde worked on the invention of the protection circuit, or whether Powers invented the protection circuit and it was integrated into the Leyde patents. Absent further explanation as to the meaning of Leyde's deposition testimony regarding the components of his invention and Powers' role in the invention of the protection circuit, summary judgment is inappropriate in this regard.

Accordingly, **IT IS HEREBY ORDERED THAT**:

1. Cardiac Science's Motion to Dismiss Certain Royal Philips Counterclaims for Patent Infringement for Lack of Standing (Doc. No. 194) is **DENIED**;

2. Cardiac Science's Motion for Partial Summary Judgment of Inequitable Conduct (Doc. No. 197) is **DENIED**.


Dated: August 1, 2005                          s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               Judge of United States District Court